UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| DAVID J. EGERMIER, | ) | CIV.   11-5095-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |
| PENNINGTON COUNTY, a political | ) | |
| subdivision of the State of South | ) | |
| Dakota, | ) | |
| | ) | |
| Defendant. | ) | |

## INTRODUCTION

Plaintiff David Egermier filed this action under the Americans with Disabilities Act, 42 U.S.C. §§ 12101–12117 (2012), and the South Dakota Human Rights Act, SDCL §§ 20-13-1 to 20-13-14.   Mr. Egermier alleges that his former employer, defendant Pennington County, fired him because of his disability and retaliated against him for requesting reasonable accommodation in the work place.   Pennington County has now filed a motion for summary judgment in its favor with respect to Mr. Egermier's complaint.   See Docket No. 18.   Mr. Egermier resists the motion, asserting that there are genuine issues of material fact which a jury must determine.   See Docket No. 28.   The district court, the Honorable Jeffrey L. Viken, Chief Judge, referred Pennington County's motion to this magistrate judge for a recommended disposition pursuant to 28 U.S.C. § 636(b)(1)(B).   See Docket No. 43.   The following is this court's recommended disposition.

## FACTS

The undisputed facts in this matter are as follows.   The factual disputes between the parties are noted.   The court also notes that, as to a number of assertions by Pennington County, Mr. Egermier does not dispute the assertions, but maintains that the facts are immaterial to the legal issues that are pertinent to this action.[1]

David Egermier is a retired military serviceman.   As a serviceman, he was a Master Sergeant in the United States Air Force, a combat veteran, a supervisor of over 1,000 individuals, a teacher at the Navy War College, and an instructor to hundreds of military personnel.   He served in the Air Force from 1985 until 2010.   His first civilian job, working for the Pennington County Health and Human Services Department, is the job at issue in this lawsuit.

The Pennington County Health and Human Services Department (hereinafter "the Department") consists of two agencies:   a County Welfare agency and the Veterans Service Office.   Karen Romey is the Director for the Department and Charlene Doorn is its Deputy Director.

The Veterans Service Office within the Department assists veterans and their dependents and survivors in applying for veterans' benefits, including benefits from the Department of Veterans Affairs and the State of South Dakota.

_____

[1] The assertions that Mr. Egermier maintains are immaterial are the following numbered paragraphs from Pennington County's statement of undisputed material facts:   1, 4-7, 9-12, 14-16, 18-22, 24, 28-30, 32-33, 51-53, 58-61, 64, 68-76, 78, 81-88, 90-92, 94, 97-100.   See Docket No. 29 at 2.

The Veterans Service Office also makes referrals to other agencies that may offer benefits for veterans.

Prior to February 19, 2010, there was an opening for a Veterans Service Officer (hereinafter "VSO") within the Veterans Service Office of the Department. Mr. Egermier applied for and received the job with a start date of April 1, 2010. Pennington County states that Mr. Egermier's application stood out from over 100 other applications because of his extensive experience and training, especially his ability to instruct and teach.   Upon beginning his employment, Pennington County gave Mr. Egermier a document with a description of the job he was embarking on.   That job description included the following:

- Interview clients to determine their needs and eligibility
- Assist clients by completing applicable forms for benefits
- Contact clients by phone or mail regarding benefits
- Follow-up on pending claims, as necessary
- Refer clients to other agencies that could assist them—provide information to clients on possible benefits available through other agencies
- Provide information on Federal VA and State veteran benefits to groups and meeting
- Provide briefings to veterans and retirees separating at Ellsworth AFB
- Keep current on information related to benefit changes including policies, procedures, forms, and application process
- Establish a basic knowledge of, and maintain a working relationship with, agencies and offices which interact with this office.   This includes a wide variety of local, state, regional and national agencies and organizations both government and private.
- Provide liaison/coordination for clients working with several offices/agencies simultaneously, as needed.
- Provide case management to veterans and families.
- Attend annual training conference and area mini-conferences for continued certification.

3

- ♦ Work with area congressional field offices.
- ♦ Assist in developing policies for this office to enhance service to clients.
- ♦ Prepare reports and correspondence, and assist with related office Operations.
- ♦ Have ability to separate professional and personal opinions when assessing the client's needs.

See Docket No. 1-2, at 1–2.   On the second page of the document was an additional catch-all statement "Perform additional duties as assigned by supervisor."   Id. at 2.   Mr. Egermier acknowledged receiving this document with his signature.   At the time of his hiring, there was only one other VSO working for Pennington County, Neal Lutke.

Pennington County receives partial funding for its Veterans Service Officers from the South Dakota Department of Veterans Affairs.   However, Pennington County decided to place its VSOs under the oversight of the County's Health and Human Services Department.   In other counties, VSOs are answerable directly to the county commission.    Mr. Egermier suffers from post-traumatic stress disorder, a service-connected disability he acquired when he was deployed.   He did not disclose this condition during his interview or at the inception of his employment because, upon review of the above job description, he did not believe his condition would have any effect on his performance of his job duties as described by the County.

The Rebound Program is a program administered by the Department. The Rebound Program assists incarcerated individuals transition from prison into society.   Inmates who participate in the program may or may not be military

4

veterans.   Barry Tice is an employee of the Department.   Specifically, he is the Rebound Project Coordinator and he supervises the program.   When Mr. Egermier began working for the Department, Terry Krebs was employed as a Rebound Case Worker.   Part of Mr. Krebs' duties was to teach a REACT program to inmates at the Pennington County Jail.[2]   In late June, 2010, Mr. Krebs quit his job with the Department.

Upon Krebs' departure, Director Karen Romey approached Mr. Egermier about assuming Mr. Krebs' duties teaching REACT classes at the jail. Mr. Egermier agreed to teach the class.   Mr. Egermier did not tell Ms. Romey about his anxiety disorder at this time, although he did make inquiry of her as to what security would be provided at the jail and what provisions there were in the event of a problem.   Mr. Egermier asserts that he was told to report to Ms. Romey if he had any problems teaching the REACT class.   There were no military veterans in the REACT class.

Mr. Egermier successfully taught the REACT class from the time Krebs left until late in August 2010.   On August 17, 2010, there was an incident at the jail involving an inmate who grabbed a correctional officer's firearm.   The inmate first attempted to point the weapon at the officer, but instead pointed it toward other inmates.   The inmate who took the weapon was subdued and later convicted of attempted murder.

---

[2] The parties do not explain the acronym "REACT."   The court infers that the program of instruction deals with anger management issues.

On Monday, August 23, 2010, at the next REACT class following this incident, a student-inmate gave Mr. Egermier a note stating that the student had witnessed the incident and it caused him mental distress because he could have been shot.   The student told Mr. Egermier that he and another inmate were key witnesses to the crime.

Mr. Egermier relayed this information to Mr. Tice, who in turn notified the Pennington County Sheriff's Office of the information.   Prior to Wednesday, August 25, 2010, the jail decided to split the REACT class into two parts—one part would be taught at the jail and the other part would be taught at the jail annex.   On August 25, Mr. Egermier wrote an email to Ms. Romey, Ms. Doorn, Mr. Tice, and his fellow VSO, Mr. Lutke, suggesting that REACT classes be suspended for two weeks to allow jailhouse tensions to subside.   Mr. Egermier expressed his belief that the dynamic at the jail following the August 17 incident was not good and felt out of the ordinary to him.

Mr. Tice contacted the Sheriff's Department.   An officer there told Mr. Tice that the files of inmates who participate in the REACT program are screened to determine if the inmate has had any behavioral issues.   Inmates whose files contain any unfavorable information are not allowed to participate in the REACT program.

On Thursday, August 26, 2010, Mr. Tice sent Mr. Egermier an email informing him that a two-week cooling off period would be implemented as to the REACT classes.   Mr. Tice relayed to Mr. Egermier the information that the

Sheriff's Office provided to him regarding the screening process for inmates wishing to take REACT classes.   Mr. Tice told Mr. Egermier that if he felt an inmate was showing signs of agitation or any kind of behavioral issue, he could excuse himself from the classroom and alert one of the correctional officers, who would then remove the inmate from class.   Finally, Mr. Tice told Mr. Egermier that he would attend REACT classes with Mr. Egermier on September 13 and 20, 2010.   Mr. Tice closed his email with the following sentence:   "Please continue to keep me informed and it is imperative that you let me know your concerns so they can be immediately addressed."   Docket No. 20, at ¶ 34.

On about Thursday, September 9, 2010, Mr. Egermier spoke with Mr. Tice in person and informed him that he suffered from a service-connected disability caused by anxiety.   Mr. Egermier told Mr. Tice that he was prescribed medication for this condition.   Mr. Egermier also informed Mr. Tice that his disability was exacerbated by teaching the REACT classes at the jail.   Mr. Tice indicated that he would speak to Director Romey about this issue.[3]

When Mr. Tice spoke to Ms. Romey, they contacted Nick Stroot with the Pennington County Human Resources office.   The two informed Mr. Stroot that Mr. Egermier suffered from an anxiety condition and that he took prescription

---

[3] The parties dispute exactly what Mr. Tice said to Mr. Egermier, although they both agree that Mr. Tice indicated he would speak to Ms. Romey.   Pennington County asserts that Mr. Tice told Mr. Egermier that he would have to discuss accommodations with Ms. Romey and Human Resources.   See Docket No. 20, at ¶ 38.   Mr. Egermier asserts that Mr. Tice did not comment on his disclosure other than to say that he would have to bring it up with Ms. Romey.   See Docket No. 29, at ¶ 38.

medication for the condition.    Mr. Stroot responded that the County would need documentation detailing what job functions Mr. Egermier's condition prevented him from performing, so the County could determine what reasonable accommodations might be made.

Later that same day, after Mr. Tice and Ms. Romey had spoken, Mr. Tice told Mr. Egermier that he should contact Human Resources.   At this time, Mr. Egermier had made a request to Mr. Tice for a specific accommodation—that another person be stationed in the classroom with him when he taught the REACT classes.   Mr. Egermier did not think he needed to contact Human Resources after this conversation because he was able to perform all the essential function of his VSO job with the agreed-upon accommodation. Because Mr. Egermier viewed his obligation to teach the REACT class as outside of his VSO job description, he believed he had fulfilled his burden by notifying Mr. Tice of the accommodation he was requesting.   Mr. Egermier did not speak with Mr. Stroot or any other County Human Resources personnel following this conversation with Mr. Tice.

Mr. Tice complied with Mr. Egermier's request for accommodation by accompanying him to his REACT classes on September 13, 20, and 27, 2010. Mr. Egermier taught each of the above REACT classes in Mr. Tice's presence.

At 6:30 a.m. on Monday, October 4, 2010, Mr. Tice called Mr. Egermier and informed him that he would not be able to accompany Mr. Egermier to the REACT class that day as he was staying home with his sick child.   Pennington

8

County asserts that, during this conversation, Mr. Tice advised Mr. Egermier that he could ask Corrections Officer Munsch to assist him if he needed help getting from the jail to the jail annex.   Mr. Egermier denies that Tice made this statement.   Mr. Tice asked Mr. Egermier during the phone call whether he would be able to teach the class alone.   Mr. Egermier responded that he would try his best.

That morning, Mr. Egermier taught the first REACT class at the jail annex. He then left the annex through a tunnel to access the second REACT class located in a classroom at the main jail complex.   While traversing the tunnel, Mr. Egermier suffered a panic attack and was unable to reach the classroom in the jail or to teach the second REACT class.   Mr. Egermier did not notify a correctional officer of his problem at the time, and does not specifically recall whether there were any such officers in the vicinity at the time.   Mr. Egermier left the jail and does not remember if he advised jail personnel that he would not be teaching the second REACT class.[4]   Upon returning to his office at the Department, Mr. Egermier did not inform anyone in the Department on either October 4th or 5th that he had not taught the second REACT class.

On October 6, 2010, Mr. Tice went to Mr. Egermier's office to ask how the REACT classes had gone on October 4.   At this time, Mr. Egermier told Mr. Tice that he had not taught the second class.   Mr. Egermier apologized, and told

---

[4] Pennington County asserts that Mr. Egermier did not notify any jail personnel that he would not be teaching the second REACT class.   Mr. Egermier's testimony was that he did not remember if he did so.

9

Mr. Tice, "I couldn't do it; I had a panic attack after the first class."  <u>See</u> Docket No. 30-4, at 32.  Mr. Egermier noted that the "deal was that [Tice] or somebody [else] would be in the class with [Egermier] and that deal wasn't in effect that day."  <u>Id.</u>  Mr. Tice then left Mr. Egermier's office.

Pennington County asserts that Mr. Tice then asked Mr. Egermier whether he had informed the jail staff that the second REACT class had not been conducted and that Mr. Egermier responded that he had not.  Mr. Egermier asserts that he told Mr. Tice that he could not remember whether he had done so.

After speaking with Mr. Egermier, Mr. Tice went to Director Romey's office. He informed Ms. Romey that Mr. Egermier had not taught the second REACT class on October 4.  Mr. Tice expressed concern that Mr. Egermier had not informed jail staff when he changed his teaching plans.  Ms. Romey asked Mr. Tice to speak with Mr. Egermier to clarify the circumstances surrounding Mr. Egermier's failure to notify jail staff and also to contact the jail directly to inquire into the same.

On October 7, 2010, Mr. Tice asked Mr. Egermier to come to his office. When Mr. Egermier arrived, he sat down.  Mr. Tice and Mr. Egermier present differing versions of the conversation that ensued.

Mr. Egermier testified that Mr. Tice told him that the more he thought about the fact that Mr. Egermier had not taught the second REACT class, the more pissed off he got.  Mr. Tice told Mr. Egermier that he couldn't believe that

10

Mr. Egermier had supervised hundreds of troops in the military, but was "too scared" to walk across the jail by himself.   Mr. Egermier told Mr. Tice at this point that he would not allow Tice to question his military credentials. Mr. Egermier further testified that he told Mr. Tice that the Department instructed him when he began teaching the REACT classes to tell the Department if there was ever a problem.   Mr. Egermier testified that he told Mr. Tice that he had a problem and that Mr. Tice could keep his f----g program.   Mr. Egermier told Mr. Tice that he was through teaching the REACT classes.   Mr. Egermier testified that he only used the "f" word once, and that he and Mr. Tice frequently used profanity in their conversations with one another.

Mr. Tice's version of the conversation is that he expressed disappointment that Egermier had not taught the second class and that Egermier had failed to inform him of this fact.   Mr. Tice told Mr. Egermier that he had supervised over 600 people and if one of his subordinates did not complete an assigned task, the subordinate would typically inform his or her supervisor.   Mr. Tice testified that Mr. Egermier told him that teaching the REACT classes was not his f----g job, and Mr. Tice could teach the class himself.   Mr. Egermier, according to Tice, then stood up, reiterated that "this is not part of [his] f----g job," and walked out of Tice's office.   Docket No. 20, at ¶ 66.

Ms. Doorn, located two offices away, testified that during this meeting Mr. Tice's and Egermier's voices became very loud, and she could hear their voices in her own office.   Ms. Doorn walked to Mr. Tice's office to ensure everything was

11

alright.   The argument between the two men lasted only one to two minutes.
Upon her arrival, Mr. Tice repeated a summary of his version of events to
Ms. Doorn.   Ms. Doorn and Mr. Tice together decided that they should discuss
this matter with Director Romey.

Ms. Doorn telephoned Ms. Romey and informed her that the meeting
between Mr. Tice and Mr. Egermier had not gone well.   She told Ms. Romey that
she had heard loud voices, and that presently, she could hear Mr. Egermier in
his office throwing things.   Ms. Doorn relayed the gist of the meeting between
Mr. Tice and Mr. Egermier.   Ms. Doorn and Ms. Romey jointly decided to place
Mr. Egermier on administrative leave with pay in order to allow him to cool down
and to discuss with him at a later time the events of the day.

After concluding the phone call, Ms. Doorn went to Mr. Egermier's office to
inform him that he was being placed on administrative leave.   According to
Ms. Doorn, Mr. Egermier became very angry at this advisement.   Ms. Doorn
testified that Mr. Egermier began taking personal items off the shelves in his
office and putting them in a box.   She assumed that he was quitting his
employment.   Mr. Egermier denies yelling or throwing things.   He testified that
he was packing some personal belongings and paperwork to review, presumably
at home.

Mr. Tice, who followed Ms. Doorn to Mr. Egermier's office, testified that
Ms. Doorn told Mr. Egermier that he was being placed on administrative leave for
insubordination for the acts of refusing to teach the REACT class, swearing at

12

Mr. Tice, and walking out of the meeting with Mr. Tice.   Mr. Tice testified that Ms. Doorn told Mr. Egermier that he needed to leave the office.   In response, Mr. Tice testified that Mr. Egermier told Ms. Doorn that he was going to notify the county commissioners, the Governor, and the Department of Veterans Affairs that he was being placed on administrative leave.

Mr. Egermier's testimony is that he inquired of Ms. Doorn why he was being placed on administrative leave.   He attempted to give Ms. Doorn his version of events, but that she had no interest in hearing his side of the story. Similarly, Mr. Egermier testified, in a subsequent conversation with Director Romey, she refused to allow him to present his version of events.   Again, Mr. Egermier denies that he was yelling or throwing objects during his meeting with Ms. Doorn.

After speaking to Mr. Egermier, Ms. Doorn again telephoned Ms. Romey. She told Ms. Romey that Mr. Egermier's behavior appeared to be escalating, that he was visibly upset, raising his voice, and putting his personal belongings into a box.

Following the meeting with Ms. Doorn, Mr. Egermier testified that he informed Mr. Lutke and the secretaries that he was being placed on administrative leave and that his appointments for that day needed to be rescheduled.   Mr. Tice and Ms. Doorn testified that Mr. Egermier walked up and down the hallways saying in a loud voice that he was being placed on administrative leave.

13

Ms. Doorn then called Director Romey a third time.   In this conversation, she explained Mr. Egermier's disruptive behavior in the hallway.   Ms. Doorn testified that clients would soon be arriving and she wanted the situation under control before they arrived.   Ms. Romey told Ms. Doorn to ask Mr. Egermier again to leave.   If he did not, Ms. Romey told Ms. Doorn that she should ask for assistance from law enforcement.

Ms. Doorn testified that Mr. Egermier finally left approximately forty-five minutes after she first notified him that he was being placed on administrative leave.   Ms. Doorn testified that she asked Mr. Egermier to leave at least three times during this forty-five minute period.   Mr. Egermier denies this.

When Mr. Egermier left the office building, Ms. Doorn testified that two other employees came to her office to report their reactions.   Deb Jensen told Ms. Doorn that she was working on Mr. Egermier's computer in his office when he began behaving erratically.   Ms. Jensen indicated that she feared for her personal safety during this time.

Another employee, Brenda Dahlke, told Ms. Doorn she was so concerned over Mr. Egermier's behavior that she stayed in her office until he left the building.   Ms. Dahlke also reported that she overheard another employee and Mr. Egermier speaking earlier that morning and heard Mr. Egermier say something to the effect that he wished that the plane the New York Yankees baseball team was traveling on would explode.   Mr. Egermier denies this.

14

After Mr. Egermier left the office, Ms. Doorn called Ms. Romey a fourth time.   She reported her version of events, including the reports from Dahlke and Jensen.   Ms. Romey decided a meeting should be convened to decide on a course of action.   The meeting was held at Ms. Romey's house with Ms. Doorn and Mr. Tice in attendance.   Mr. Stroot from Human Resources also attended the meeting, either in person or via telephone.   The four discussed the events of the day and decided that Mr. Egermier should be fired.   Ms. Romey telephoned Mr. Egermier and informed him that his employment was terminated effective immediately.

After receiving notification of his termination, Mr. Egermier returned to his office to retrieve his personal belongings.   Before leaving, he placed a patch bearing military stripes on his office door together with a note reading "Daddy didn't give me these.   I earned them."   Docket No. 20, at ¶ 98.   Mr. Egermier testified that he intended this act to communicate his belief that Mr. Tice held his job because his father was a former South Dakota state circuit court judge who exercised his influence to get Mr. Tice his current job.   Mr. Egermier intended to contrast Mr. Tice's perceived situation with his own employment secured through his own efforts in the military.   Mr. Egermier testified that he later felt bad about doing this, realizing that it was unprofessional.   He contacted Human Resources to apologize to Mr. Tice, Ms. Romey, and Ms. Doorn and to express thanks for the opportunity to work for the Department.

In the wake of the events of October 7, 2010, Mr. Tice called his wife and told her to remove their infant son from their house and not to return to the house.   Mr. Tice testified that he did this because he lives one block away from Mr. Egermier, and he was concerned for his and his family's safety.

Mr. Egermier appealed the termination of his employment to the Pennington County Commissioners.   The Commission affirmed his dismissal. On November 15, 2010, Mr. Egermier filed a charge of discrimination alleging that Pennington County had violated his rights under the Americans with Disabilities Act (hereinafter "ADA") by discriminating against him on account of his disability and by retaliating against him.   On April 12, 2011, the South Dakota Division of Human Rights issued a finding of no probable cause.   On September 9, 2011, the Equal Employment Opportunity Commission adopted the finding of the South Dakota Division of Human Rights and issued a right to sue letter to Mr. Egermier.

Mr. Egermier filed his complaint in this case on December 8, 2011.   In that document, he alleges that Pennington County violated his rights under the ADA and South Dakota state law by terminating his employment due to his disability and by retaliating against him for requesting a reasonable accommodation.   Mr. Egermier requests a trial by jury, compensatory damages, and reasonable attorney's fees.

16

## DISCUSSION

### A.   Summary Judgment Standard

Under Rule 56(a) of the Federal Rules of Civil Procedure, summary

judgment is appropriate where the moving party "shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a

matter of law."   FED. R. CIV. P. 56(a).   The court must view the facts, and

inferences from those facts, in the light most favorable to the nonmoving party.

See Matsushita Elec. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986)

(citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Helton v.

Southland Racing Corp., 600 F.3d 954, 957 (8th Cir. 2010) (per curiam).

Summary judgment will not lie if the evidence is such that a reasonable jury

could return a verdict for the nonmoving party.   See Anderson v. Liberty Lobby,

Inc., 477 U.S. 242, 248 (1986); Allison v. Flexway Trucking, Inc., 28 F.3d 64, 66

(8th Cir. 1994).

The burden is placed on the moving party to establish both the absence of

any genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law.   FED. R. CIV. P. 56(a).   Once the movant has met

its burden, the nonmoving party may not simply rest on the allegations in the

pleadings, but must set forth specific facts, by affidavit or other evidence,

showing that a genuine issue of material fact exists.   Anderson, 477 U.S. at 256;

FED. R. CIV. P. 56(e) (each party must properly support its own assertions of fact

17

and properly address the opposing party's assertions of fact, as required by Rule 56(c)).

The underlying substantive law identifies which facts are "material" for purposes of a motion for summary judgment.   Anderson, 477 U.S. at 248. "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or unnecessary will not be counted."   Id. (citing 10A CHARLES ALAN WRIGHT, ARTHUR R. MILLER & MARY KAY KANE, FEDERAL PRACTICE AND PROCEDURE § 2725, at 93–95 (3d ed. 1983)).   "[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact."   Id. at 247–48.

Essentially, the availability of summary judgment turns on whether a proper jury question is presented:   "The inquiry performed is the threshold inquiry of determining whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Id. at 250.   "There is no 'discrimination case exception' to the application of summary judgment, which is a useful pretrial tool to determine whether any case, including one alleging discrimination, merits a trial."   Pye v. Nu Aire, Inc., 641 F.3d 1011, 1018 (8th Cir. 2011) (citing Torgerson v. City of Rochester, 643 F.3d 1031, 1043 (8th Cir. 2011)).

18

**B.    The Appropriateness of Summary Judgment on Egermier's Discrimination and Retaliation Claims**

    **1.    What Standard Applies to Evaluation of Egermier's Claims?**

        **a. Current Eighth Circuit Case Law**

The parties, in their briefing, posit that a plaintiff bringing a claim under the ADA may survive a motion for summary judgment in two ways.[5]   First, if the plaintiff can provide "direct evidence" of discrimination, summary judgment is not appropriate.   Griffith v. City of Des Moines, 387 F.3d 733, 736 (8th Cir. 2004).   A plaintiff provides direct evidence of discrimination by "'showing a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated' the adverse employment action."   Id. (quoting Thomas v. First Nat'l Bank of Wynne, 111 F.3d 64, 66 (8th Cir. 1997)).

Alternatively, a plaintiff that is unable to present direct evidence of discrimination can survive a defendant's motion for summary judgment if he or she raises an inference of discrimination under the McDonnell-Douglas burden-shifting analysis.   Id.; see also McDonnell Douglas Corp. v. Green, 411

---

[5] Mr. Egermier asserts a parallel claim under SDCL § 20-13-10.   Although the South Dakota Supreme Court appears not to have addressed the issue yet, this court believes that South Dakota would adopt federal law in analyzing a disability discrimination claim under state law.   See Petersen v. ProxyMed, Inc., 617 F. Supp. 2d 835, 845 (D.S.D. 2008).   South Dakota looks to federal law which has developed under Title VII with regard to race and sex discrimination claims asserted under state law.   See Huck v. McCain Foods, 479 N.W.2d 167, 169 (S.D. 1991).   The parties do not draw a distinction between Mr. Egermier's state and federal claims.   Accordingly, the court applies federal law to resolve Mr. Egermier's state disability discrimination and retaliation claims.

U.S. 792, 802–04 (1973); <u>Olsen v. Capital Reg'l Med. Ctr.</u>, 713 F.3d 1179, 1153

(citing <u>Young v. Warner-Jenkinson Co.</u>, 152 F.3d 1018, 1021 (8th Cir. 1998)).

The <u>McDonnell-Douglas</u> analysis requires the plaintiff to first prove a

*prima facie* case of discrimination.   Under the ADA, employers are barred from

discriminating "against a qualified individual on the basis of disability."   42

U.S.C. § 12112(a) (2012).   To establish a claim of discrimination under the ADA,

a plaintiff must show the following:   "(1) that he is disabled within the meaning

of the [ADA]; (2) that he is qualified to perform the essential functions of the job

either with or without accommodation; and (3) that he has suffered adverse

employment action" under circumstances giving rise to an inference of unlawful

discrimination.   <u>Fjellestad v. Pizza Hut of Am., Inc.</u>, 188 F.3d 944, 948 (8th Cir.

1999) (citations omitted); <u>see</u> <u>also</u> <u>Rask v. Fresenius Med. Care N. Am.</u>, 509 F.3d

466, 469 (8th Cir. 2007) (citing <u>Dropinski v. Douglas Cnty., Neb.</u>, 298 F.3d 704,

706–07 (8th Cir. 2002)); <u>Wallin v. Minn. Dep't of Corr.</u>, 153 F.3d 681, 686 (8th

Cir. 1998) (quoting <u>Miners v. Cargill Commc'ns</u>, 113 F.3d 820, 823 (8th Cir.

1997)).

To show a *prima facie* case of retaliation under the ADA, Mr. Egermier

must show that "(1) [he] engaged in statutorily protected activity, (2) [he] suffered

an adverse employment action, and (3) a causal connection exists between the

protected activity and the adverse employment action."   <u>Thomas v. Corwin</u>, 483

F.3d 516, 530 (8th Cir. 2007) (citing <u>Box v. Principi</u>, 442 F.3d 692, 696 (8th Cir.

2006)).   Opposing an employment practice that one reasonably believes to be

20

unlawful constitutes a protected activity.   Barker v. Mo. Dep't of Corr., 513 F.3d 831, 834 (8th Cir. 2008).

If the employee satisfies this *prima facie* showing, the burden shifts to the employer to show a "legitimate, nondiscriminatory reason for the adverse employment action."   Dovenmuehler v. St. Cloud Hosp., 509 F.3d 435, 439 (8th Cir. 2007) (citing McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802–03 (2003)).   Finally, to prevail, the employee must "show that the defendant's proffered reason was a pretext for discrimination."   Id. (citing McDonnell, 411 U.S. at 802–03).

The difference between the "direct evidence" approach and the McDonnell-Douglas analysis is this.   The Eighth Circuit applies the "direct evidence" requirement in mixed motive cases—i.e. those cases where discrimination was "a" motivating factor for an adverse employment decision, but other nondiscriminatory motivations existed concurrently.   Griffith v. City of Des Moines, 387 F.3d 733, 735–36 (8th Cir. 2004).   The McDonnell-Douglas analysis "creates a shifting set of evidentiary burdens aimed at smoking out the single, ultimate reason for the adverse employment decision."   Wright v. Murray Guard, Inc., 455 F.3d 702, 720 (6th Cir. 2006) (Moore, J., concurring) (citation omitted).   Thus, McDonnell-Douglas applies when a plaintiff alleges that the sole reason for an adverse employment decision was a discriminatory reason. Id.   Here, Mr. Egermeier invokes the mixed motives analysis, but also   argues in the alternative under McDonnell-Douglas.

21

### b.  The Change Wrought by the Civil Rights Act of 1991 and Desert Palace

The court questions whether the requirement of "direct evidence" in order to invoke the mixed motives analysis continues to be applicable after the Supreme Court's decision in Desert Palace, Inc. v. Costa, 539 U.S. 90,   (2003). In order to understand the import of Desert Palace, it is necessary to revisit the Court's opinion in Price Waterhouse v. Hopkins, 490 U.S. 228 (1989), and the Congressional reaction to Price Waterhouse in the Civil Rights Act of 1991.

In Price Waterhouse, the Court was faced with a factual scenario involving "mixed motives," where both legitimate and discriminatory reasons motivated the employer's decision.   Price Waterhouse, 490 U.S. 231–37.   The case was tried to the district court.   Id.   A plurality of the Supreme Court held on appeal that if the employer in such a case could prove that it would have reached the "same decision" even absent the discriminatory consideration, then the employer could avoid liability under Title VII.   See id. at 242, 261 (White, J., concurring), 261 (O'Connor, J., concurring).   Justice O'Connor introduced the direct/circumstantial divide by writing that a plaintiff must introduce "direct evidence that an illegitimate criterion was a substantial factor in the [employment] decision."   Id. at 276 (O'Connor, J., concurring).

Congress disagreed and legislatively abrogated the Supreme Court's decision in Price Waterhouse with the Civil Rights Act of 1991.   Congress did so by specifically providing that Title VII outlaws employment practices that are motivated even in part by a discriminatory motive.   See 42 U.S.C. § 2000e-2(m).

22

If a plaintiff makes a showing that a discriminatory motive, along with other factors, supported the adverse employment action, then an employer has a limited affirmative defense.   See id.; 42 U.S.C. § 2000e-5(g)(2)(B).   If the employer can make the "same decision" showing (i.e. that it would have reached the same employment decision even without the discriminatory factor), then the remedies available to the plaintiff are limited to declaratory relief, certain types of injunctive relief, and attorney's fees and costs.   See 42 U.S.C. § 2000e-5(g)(2)(B)(i).   The employee may not receive back pay and compensatory damages in a "mixed motive" case where the employer is able to prove that it would have reached the "same decision" without consideration of the unlawful motive.   Id. at § 2000e-5(g)(2)(B)(i)–(ii).

In Desert Palace, the Court opined on the effects of the Civil Rights Act of the 1991 on jury instructions in mixed-motive cases.   Desert Palace, Inc. v. Costa, 539 U.S. 90, 98 (2003).   Relying on the clear language of § 2000e-2(m), the Court held that a plaintiff in a mixed-motives case need not produce direct evidence of discrimination.   Id. at 98–101.   Instead, the Court held that plaintiffs were required to prove their case by a preponderance of the evidence, using either direct or circumstantial evidence.[6]   Id. at 99 (citations omitted).

_____

[6] The Court noted that the plaintiff's burden to show discrimination was a "motivating factor" and the defendant's burden to show the "same decision," were described by Congress using the same exact term:   to "demonstrate." Desert Palace, 539 U.S. at 100–01.   Therefore, if a plaintiff has a heightened burden of proving mixed motives by adducing direct evidence, it would follow that a defendant would have the same heightened burden to prove same decision by adducing direct evidence.   Id. at 101.   Counsel for the defendant at oral

23

The <u>Desert Palace</u> Court expressly overruled the Eighth Circuit's decision in <u>Mohr v. Dustrol, Inc.</u>, 306 F.3d 636 (8th Cir. 2002).   <u>Desert Palace</u>, 539 U.S. at 95, 98–99, 101.   In <u>Mohr</u>, the Eighth Circuit reversed a district court's grant of summary judgment in favor of the employer-defendant, Dustrol, with respect to employee-plaintiff Mohr's failure to rehire claim.[7]   <u>Mohr</u>, 306 F.3d at 638.   In evaluating the district court's grant of summary judgment, the Eighth Circuit stated that the plaintiff could evade the entry of summary judgment against her if she could satisfy the <u>McDonnell-Douglas</u> tripartite analysis or, alternatively, if she could show direct evidence of discrimination.   <u>Id.</u> at 639–40.   Because Mohr produced direct evidence of discrimination, the court reviewed her claim under the "mixed motive" analysis.   <u>Id.</u>   Under this analysis the employer could not escape liability with respect to declaratory judgment, injunctive relief, and attorney's fees, although it could escape an award of back pay and compensatory damages, with a "same decision" showing.   <u>Id.</u>; see also 42 U.S.C. § 2000e-5(g)(2)(B).   Because Mohr showed direct evidence of discrimination, the Eighth Circuit held that it was error to grant summary judgment in favor of the

---

argument in the <u>Desert Palace</u> case declined to agree that defendants should be bound by any heightened standard.   <u>Id.</u>   If the Eighth Circuit continues to adhere to its "direct evidence" requirement, it should also apply that requirement to employers who seek to prove "same decision."   <u>Id.</u>   That is because the plaintiff's burden and the defendant's burden are described by Congress using the same term "demonstrate." Id. at 100–01 (comparing the language used by Congress in 42 U.S.C. § 2000e-2(m) with the language used in 42 U.S.C. § 2000e-5(g)(2)(B)).

[7] The Eighth Circuit affirmed the district court's grant of summary judgment on a failure to train claim because Mohr had not exhausted her administrative remedies as to this claim.   <u>Mohr</u>, 306 F.3d at 643–46.

defendant.   Id. at 639–43.   The Mohr court specifically invoked the direct-evidence analysis from Price Waterhouse, which by the time Mohr was decided, had been legislatively superseded by the Civil Rights Act of 1991.   Id. at 640.

In Griffith v. City of Des Moines, the Eighth Circuit rejected the argument that the Supreme Court in Desert Palace had altered the analysis for summary judgment motions in mixed-motive discrimination cases.   Griffith v. City of Des Moines, 387 F.3d 733 (8th Cir. 2004).   The Griffith court rejected the Supreme Court's analysis in Desert Palace by distinguishing the procedural posture of the case considered by the Supreme Court in Desert Palace, namely that the case had been tried to a jury.   Id. at 735.   Thus, because Griffith involved a motion for summary judgment, rather than what the appropriate jury instructions at a trial should have been, the Griffith court held that Desert Palace had no effect on the Eighth Circuit's summary judgment law.   Id. at 735–37.

The Griffith court's rationale ignores the fact that Desert Palace expressly overruled Mohr, and Mohr was a summary judgment case, not a jury trial case. Mohr, 306 F.3d at 638.   In an *en banc* decision, the Eighth Circuit recognized the abrogation of Mohr by Desert Palace.   See Torgerson v. City of Rochester, 643 F.3d 1031, 1044 (8th Cir. 2011) (en banc).

Eighth Circuit's decision not to apply Desert Palace to summary judgment motions is in error.   First, it ignores the fact that the decision in Desert Palace was not premised on the procedural posture of the case:   the Court's decision

25

was founded on the bedrock of the statutory language of the Civil Rights Act of 1991, which applies at all procedural stages of a discrimination case, not just at trial.   Second, the Eighth Circuit ignores the fact that the Court in Desert Palace expressly overruled Mohr by name, and Mohr was a summary judgment case.   If the Court's holding in Desert Palace was limited to only cases involving the drafting of jury instructions, the Desert Palace Court would not have mentioned Mohr, let alone overruled it, by name.

Despite the Eighth Circuit's position in Griffith, other courts in the wake of Desert Palace have recognized that a discrimination plaintiff need not adduce "direct evidence" in order to avail themselves of the mixed-motive analysis—even at the summary judgment stage.   See Chadwick v. WellPoint, Inc., 561 F.3d 38, 45–46 (1st Cir. 2009); Holcomb v. Iona Coll., 521 F.3d 130, 141 (2d Cir. 2008); Fye v. Okla. Corp. Comm'n., 516 F.3d 1217, 1226 n.6 (10th Cir. 2008); Wright v. Murray Guard, Inc., 455 F.3d 702, 712–13 (6th Cir. 2006); Rachid v. Jack In The Box, Inc., 376 F.3d 305, 311–12 (5th Cir. 2004); Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 284–86, 297–98 (4th Cir. 2004); Stegall v. Citadel Broad. Co., 350 F.3d 1061, 1067–68 (9th Cir. 2003) (amended Jan. 6, 2004). These courts allow the plaintiff to prove that discrimination was "a" motivating factor through the use of either direct or circumstantial evidence.   Chadwick, 561 F.3d at 45–46; Holcomb, 521 F.3d at 141; Fye, 516 F.3d at 1226 & n.6; Wright, 455 F.3d at 712–13; Rachid, 376 F.3d at 311–12; Hill, 354 F.3d at 284–86, 297–98; Stegall, 350 F.3d at 1068.

26

The conclusion seems inescapable that, after <u>Desert Palace</u>, the Eighth Circuit is wrong to adhere to a "direct evidence" requirement in mixed motive cases, at either summary judgment or at trial.   This court is, of course, bound by Eighth Circuit precedent, but so too is it bound by Supreme Court case law, which represents the supreme law of the land.   <u>Nitro-Lift Techs., L.L.C. v. Howard</u>, 133 S. Ct. 500, 503 (2012); <u>Rivers v. Roadway Express, Inc.</u>, 511 U.S. 298, 312–13 (1994).   To the extent possible, this court analyzes the evidence adduced by Mr. Egermeier under both standards.

The court notes that, although <u>Griffith</u> and <u>Desert Palace</u> adjudicated claims arising under Title VII of the Civil Rights Acts of 1964 and 1991, and Mr. Egermier's claims are premised on the ADA, the Eighth Circuit applies the same Title VII analysis, including a mixed-motive analysis, to ADA claims.   <u>See</u> <u>Kiel v. Select Artificials, Inc.</u>, 169 F.3d 1131, 1135–36 (8th Cir. 1999) (en banc).   In addition, the ADA specifically incorporates by reference the Title VII provision dealing with the "same decision" affirmative defense.   <u>See</u> 42 U.S.C. 12117(a) (2012) (incorporating the "powers, remedies, and procedures" described under the Title VII provision codified at 42 U.S.C. § 2000e-5).   Furthermore, just as Congress, in passing the Civil Rights Act of 1991, rebuked the Supreme Court for its too-strict construction of Title VII, a similar Congressional reaction emerged regarding the ADA.

After the Supreme Court issued opinions narrowly construing the ADA, Congress reacted by passing the 2008 ADA Amendments, which legislatively

27

overturned the Supreme Court's previous decisions narrowly construing the ADA.   See ADA Amendments Act of 2008, Pub. L. No. 110-325, 122 Stat. 3553 (2008) ( expressly overturning Toyota Motor Mfg., Ky., Inc. v. Williams, 534 U.S. 184 (2002); and Sutton v. United Air Lines, Inc., 527 U.S. 471 (1999)).

Congress found the Court's decisions to be "inconsistent with congressional intent, by expressing too high a standard," for ADA plaintiffs to meet.   ADA Amendments Act of 2008 § 2(a)(8).   Congress declared that the holdings in Toyota, Sutton, and other cases "narrowed the broad scope of protection intended to be afforded by the ADA, thus eliminating protection for many individuals whom Congress intended to protect."   Id. § 2(a)(4).

In the 2008 ADA Amendments, Congress elaborated on the definition of "disability" by stating that the term was to "be construed in favor of broad coverage of individuals under this chapter, to the maximum extent permitted by the terms of this chapter."   42 U.S.C. § 12102(4)(A).   Congress specified that "[t]he term 'substantially limits' shall be interpreted consistently with the findings and purposes of the ADA Amendments Act of 2008."   Id. § (4)(B). Those findings stated that:

> Congress recognized that physical and mental disabilities in no way diminish a person's right to fully participate in all aspects of society, but that people with physical or mental disabilities are frequently precluded from doing so because of prejudice, antiquated attitudes, or the failure to remove societal and institutional barriers.

ADA Amendments Act of 2008 § 2(a)(2)..

Congressional action in 2008 regarding the ADA mirrors the congressional action in 1991 regarding Title VII.   Congress stated in 1991 that Price Waterhouse "severely undercut" the comprehensive intent of Title VII to ban *all* consideration of discrimination in the workplace.   H.R. Rep. No. 102–40(I), at 45–48 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 583–86.   Because Congress has expressed the intent that both the ADA and Title VII be applied as comprehensively as possible—consistent with the language of each statute, the Court's holding in Desert Palace is equally applicable to ADA cases.

### 2.   Analysis of the Facts Adduced by Egermier

### a.   Whether Mr. Egermier Produced Sufficient Facts

Pennington County characterizes Mr. Egermier's firing as being based solely on Mr. Egermier's misbehavior at the workplace (i.e., his yelling, throwing things, and using profane language).   However, the court is required to view the facts in the light most favorable to Mr. Egermier since he is the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587–88 (1986). The facts, viewed in this light, are more nuanced.

First, although Mr. Tice was Mr. Egermier's supervisor as concerned the REACT program, they had an informal relationship wherein they discussed "guy things, sports and whatnot."   See Docket No. 30-4, at 33.[8]   They both used the

---

[8] Both parties filed only excerpts of Mr. Egermier's deposition.   Thus, the court cites to both Docket No. 30-4 (plaintiff's filing of Egermier deposition excerpts), and Docket No. 25-8 (defendant's filing of Egermier deposition excerpts). Unless otherwise noted, all citations are to the page numbers indicated by the court's electronic docket.

"f" word and other curse words "all the time" when they conversed with each other.   Id. at 34.

On the day Mr. Egermier was fired, Mr. Tice summoned Egermier to Tice's office.   According to Mr. Egermier, the following took place:

> [Tice] started right off, leaned back in his chair, put his hands
> behind his head and said, ['] just—the more I thought about it last
> night, the more angry and then pissed off I became about [the fact
> that Mr. Egermier failed to teach the second REACT class at the jail
> and then failed to notify the jail of the same].   I can't believe that
> you supervised hundreds of individuals in the military but are *too
> scared* to walk across the jail by yourself.[']

Id. at 33 (emphasis added) (Mr. Egermier paraphrasing Mr. Tice).   In response to this challenge issued by Mr. Tice, Mr. Egermier responded:

> [']Barry, . . . I can put up with a lot of things, but I'm not going to
> have somebody question my military service. . . . [Y]ou told me when
> I started [teaching REACT] to tell you if there was a problem.   And I
> told you there was a problem, as hard as it was for me to mention
> about a mental health disability that I don't really necessarily have
> control of.   And, . . . I'm through discussing this. . . . you can keep
> your [f----g] program . . . . I'm going back to servicing veterans, what
> I was hired to do.[']   And I went back to my office.

Id. at 33–34 (Mr. Egermier paraphrasing himself).

Upon leaving Mr. Tice's office, Mr. Egermier went back to his office.   Id. at 34.   Then, five minutes later, he went to the office of Mr. Lutke, the only other VSO in the Department, and relayed the events that had just occurred.   Id. Neal told Mr. Egermier that Deputy Director Charlene Doorn had been listening through the wall to the conversation between Mr. Egermier and Mr. Tice.   Id. at 34–35.

Mr. Egermier admitted to being upset, though not with Mr. Tice personally. Rather, as he articulated it, he was upset that:

> I had told them that I had an issue with [teaching the REACT classes in the jail] and that we had come to some agreement.   And now, we kept—I felt the situation had kept pushing.   We started from one class.   We have the attempted murder with the note.   And then we split it to two classes, as if that helped.   And it just raised my anxiety more and more.   And then when I mentioned that I can't do this anymore, I was just—pretty much just being made to do something that he [Mr. Tice] couldn't have done himself. Otherwise, why would he have attended.   That situation.   It was upsetting.

See id. at 35–36.

After the conversations with Mr. Tice and Mr. Lutke, Mr. Egermier returned to his office and went back to servicing veterans.   Id. at 36.   He began preparing for his next appointment.   Id.   He unequivocally denies "storming around," yelling, or throwing things.   Id. at 36–37.

About fifteen minutes later, Ms. Doorn came into Mr. Egermier's office and told him she was placing him on administrative leave.   Id. at 37.   Mr. Egermier asked, "for what?"   Id.   She responded that it was due to the conversation with Mr. Tice that had just occurred.   Id.   Mr. Egermier said, "you're kidding me, right?"   Ms. Doorn indicated she was not.   Id.   Mr. Egermier stated that if she was firing him over a disability that he was unable to control that was wrong. Id.   Ms. Doorn said they would discuss it further on the following Monday.   Id.

After the conversation with Ms. Doorn, Mr. Egermier went to Mr. Lutke's office to inform him that he would have to take over Mr. Egermier's appointments with veterans for that day as he was being placed on administrative leave.   Id. at

31

37–38.   Ms. Doorn followed Mr. Egermier to Mr. Lutke's office.   Id. at 38.
Mr. Egermier notified two secretaries that he was leaving because he had been
placed on administrative leave and that they should rearrange the eight
appointments on his calendar for that day.   Id.   Mr. Egermier went to the office
refrigerator to retrieve his lunch, packed up some office work to do from home,
and went to the parking lot.   Id.   Mr. Egermier left Pennington County's
premises.   Id. at 38–39.   Mr. Egermier denies yelling or throwing anything
during these events.   Id. at 39.

Subsequently, Mr. Egermier got into his car and began driving home.   See
id. at 40.   Shortly before reaching his residence, approximately twenty minutes
after he had left the office, Ms. Romey telephoned him and fired him.   Id.   She
stated "threats, insubordination, and too military of an attitude" and threats as
the reasons for firing him.   Id.   Ms. Romey was not physically present in the
office to witness these events; rather, her decision to fire Mr. Egermier was based
on the reports of his conduct as described by Mr. Tice and Ms. Doorn.

Mr. Egermier returned to the office a short time later to collect his personal
belongings from his office and to return his office key.   Id. at 41.   Before leaving
the building, Mr. Egermier taped his military stripes to his office door along with
a note saying "Daddy didn't give me these.   I earned them."   See Docket No.
25-8, at 17.   Mr. Egermier later regretted having done this, but said that it was a
reference to the fact that it was rumored that Mr. Tice obtained his job with
Pennington County because his father had been a county judge.   Id.

32

The County has adduced sworn testimony to support its assertion that Mr. Egermier was indeed yelling, ranting, and throwing things on the day he was fired.   However, the court must view the evidence in the light most favorable to the nonmoving party, Mr. Egermier, and the court notes that he has produced sworn testimony that he was not yelling or throwing things.   Furthermore, credibility determinations, such as attempting to decide whether the County's witnesses are telling the truth or whether Mr. Egermier is telling the truth, are not appropriate on summary judgment.   See Quick v. Donaldson Co., 90 F.3d 1372, 1376–77 (8th Cir. 1996) ("At the summary judgment stage, the court should not weigh the evidence, make credibility determinations, or attempt to determine the truth of the matter.").   While it is true that Mr. Egermier may not simply "rest on mere allegations . . . [in the] pleadings" in order to resist summary judgment, he has not done this.   Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 259 (1986).   Instead, his version of events is supported by his own testimony given under oath.   This is appropriate evidence with which to resist summary judgment.   See FED. R. CIV. P. 56(c)(1)(A) ("A party asserting that a fact cannot be or is genuinely disputed must support the assertion by:   (A) citing to particular parts of materials in the record, including depositions . . . .").

Viewing the events in the light most favorable to Mr. Egermier—i.e., through his own sworn testimony of the events—the court finds there is sufficient evidence in the record   to conclude that a discriminatory motive played "a" motivating part in Pennington County's decision to terminate Mr.

33

Egermier.   The impetus to fire Mr. Egermier came from his conversation with
Mr. Tice.   In that conversation, Mr. Tice stated "I can't believe that you . . . are
too scared to walk across the jail by yourself."   This is a clear reference to Mr.
Egermier's disability—his Post-Traumatic Stress Disorder (hereinafter
"PTSD")—and the statement is also just as clearly being used in a pejorative
manner.   Mr. Tice is attempting to devalue a valid, clinical diagnosis of Mr.
Egermier's mental condition by summarily dismissing the medical diagnoses and
replacing it with his own, namely that Mr. Egermier is merely "too scared" to walk
down a hallway.   Furthermore, this statement occurred only minutes before Mr.
Egermier was placed on administrative leave, and less than an hour before he
was fired.   The court finds this evidence sufficient to establish that a
discriminatory animus was in the mix of motives that led Pennington County to
fire Mr. Egermier.

Furthermore, even applying the Eighth Circuit's requirement that
Mr. Egermier adduce "direct evidence" of discrimination, the court finds that
Mr. Egermier has satisfied this more stringent standard.   The Eighth Circuit
has held statements, such as "a woman can't handle the job," "a woman in a
man's job," "women in sales were the worst thing," and a foreman's statement
that he wanted to have an all-male work crew, to be direct evidence of sex
discrimination.   See McCullough v. Univ. of Ark. for Med. Scis., 559 F.3d 855,
860–61 (8th Cir. 2009); Mohr v. Dustrol, Inc., 306 F.3d 636, 640 (8th Cir. 2002),
abrogated by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (abrogating on

34

other grounds); <u>cf.</u> <u>Simmons v. New Pub. Sch. Dist. No. Eight</u>, 251 F.3d 1210, 1213–14 (8th Cir. 2001), <u>abrogated by</u> <u>Torgerson v. City of Rochester</u>, 643 F.3d 1031 (8th Cir. 2011) (abrogating on other grounds); <u>Stacks v. Soutwestern Bell Yellow Pages, Inc.</u>, 27 F.3d 1316, 1318, 1324 (8th Cir. 1994).

Comments that hiring plaintiff was like "raising little terrorist kids" and that employees should "leave their blackness behind" were deemed not to be direct evidence of discrimination because they were unconnected with the decision makers who actually made the employment decision at issue.   <u>See</u> <u>Arraleh v. Cnty. of Ramsey</u>, 461 F.3d 967, 974–75 (8th Cir. 2006) (internal quotation marks omitted).   Similarly, identifying the plaintiff as "pregnant" or "the pregnant girl teller" was not direct evidence of discrimination where the terms were used to convey the plaintiff's physical status without any negative connotation or bias.   <u>See</u> <u>Elam v. Regions Fin. Corp.</u>, 601 F.3d 873, 878–79 (8th Cir. 2010) (internal quotation marks and parentheses omitted).

Here, the statement by Mr. Tice was a direct reference to Mr. Egermier's disability.   And, unlike the use of the term "pregnant" in <u>Elam</u>, the use of the description "too scared" was clearly meant to demean and belittle Mr. Egermier on account of his disability.   In addition, with regard to Mr. Egermier's retaliation claim, Mr. Tice's words appear to show resentment over the reasonable accommodation Pennington County provided to Mr. Egermier on account of his disability.

35

### b.   Cat's Paw Liability

Pennington County argues that it should not be held liable because Ms. Romey, not Mr. Tice, made the ultimate decision to fire Mr. Egermier, and there is no evidence that Ms. Romey was, even partially, motivated by a discriminatory animus.   The Supreme Court recently addressed the standard for so-called "cat's paw"[9] liability where a biased supervisor influences an ultimate decision maker in a mixed motive case.   See Staub v. Proctor Hosp., 131 S. Ct. 1186 (2011).

In Staub, the plaintiff was both a reservist in the army and an angiography technician for the defendant-hospital .   Id. at 1189.   Mr. Staub's immediate supervisor and the supervisor above her were hostile to Staub's military obligations and discriminated against him because of those obligations.   Id. Mr. Staub's immediate supervisor disciplined Staub in January for leaving his work area, allegedly in violation of hospital policy.   Id.   Mr. Staub denied that the policy existed and, even if it did exist, he denied that he violated the policy. Id.   In April, the supervisor second up in the chain of command informed the vice president of human resources and the hospital's chief operating officer that

---

[9]  The term "cat's paw" was coined by Judge Richard Posner of the Seventh Circuit and originates from an Aesop fable in which a monkey flatters a cat into extracting roasting chestnuts from a fire.   Staub, 131 S. Ct. at 1190 n.1 (citing Shager v. Upjohn Co., 913 F.2d 398, 405 (7th Cir. 1990).   After the cat has done so, burning its paws in the process, the monkey takes the chestnuts and leaves the cat with nothing.   Id.   The cat is similar to princes who do things on behalf of the monarch because the monarch flatters them, but who end up with nothing.   Id.

36

Mr. Staub had again violated the policy for which he had been disciplined in January.   Id.   Mr. Staub again denied that he had violated the rule.   Id.

The vice president reviewed Mr. Staub's personnel file, in which both incidents were documented, and decided to fire Mr. Staub.   Id.   There was no allegation that the vice president was guilty of any military-service bias as concerned Staub.   Id. at 1189–90.   Mr. Staub sued the hospital under the Uniformed Services Employment and Reemployment Rights Act of 1994, 38 U.S.C. §§ 4301–4335 (2012), alleging that discriminatory animus toward his military service on the part of his immediate supervisor and her immediate supervisor had influenced the vice president's decision to fire him.   Staub, 131 S. Ct. at 1190.

The Court noted that the statute Mr. Staub sued under was "very similar" to Title VII in that both provided for employer liability under a mixed-motive analysis.   Id. at 1191–92.   The Court adopted a proximate cause standard for such liability, borrowing from tort law.   Id. at 1192–94.   The Court explained that a harm may have more than one proximate cause and that one cause will be considered a superseding cause of the harm "only if it is a 'cause of independent origin that was not foreseeable.'"   Id. at 1192 (quoting Exxon Co., U.S.A. v. Sofec, Inc., 517 U.S. 830, 837 (1996)).   The Court noted that an employer often allocates among many agents the power to reward, dismiss, or punish employees and that not all of these supervisors will have the power to fire.   Id. at 1192–93. If the underling supervisor makes a negative report or disciplinary action

37

motivated by bias, and that report influences the ultimate supervisor who fires the employee, even if the ultimate supervisor is not aware of the underling's illegal bias, the bias will be a proximate cause of the firing.   Id. at 1193.   The Court justified this result by noting that, "[t]he employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and did in fact cause, an adverse employment decision."   Id.

The Staub decision does not represent a drastic departure from pre-existing Eighth Circuit case law.   For example, in Mohr, discussed previously, it was undisputed that the ultimate decision makers who decided whether to rehire Mohr did not themselves exhibit any discriminatory animus. Mohr v. Dustrol, Inc., 306 F.3d 636, 641 (8th Cir. 2002), abrogated by Desert Palace, Inc. v. Costa, 539 U.S. 90 (2003) (abrogating on other grounds). However, the supervisor responsible for Ms. Mohr's former work crew did have discriminatory animus.   Id. at 640.   Although the ultimate decision makers were unaware of their underling's discriminatory animus, they relied on his statement that he did not want Ms. Mohr on his crew when they decided not to rehire her.   Id. at 641–42.   Thus, like the vice president in Staub, the ultimate decision makers in Mohr were not motivated by discrimination and they were unaware of their underling's discriminatory bias, but the company was potentially liable if the plaintiff could prove that the underling's statements helped inform the ultimate decision makers in reaching their decision.   Id.   See also Arraleh v. Cnty. of Ramsey, 461 F.3d 967, 974–75 (8th Cir. 2006) (holding

38

that discriminatory statements by non-decision makers would not be considered direct evidence because there was no evidence in the record that the ultimate decision maker was influenced by the bias of the other two underlings); Kiel v. Select Artificials, Inc., 169 F.3d 1131, 1135 (8th Cir. 1999) (en banc) (evaluating an employer's liability based on whether any person in the chain-of-command leading up to the ultimate decision maker evinced sufficient discriminatory animus to allow a jury to infer that discrimination was a motivating factor in the decision to fire).

Here, the discriminatory animus was voiced by Mr. Egermier's immediate supervisor in the REACT program, Mr. Tice.   Mr. Tice told Ms. Doorn that he believed Mr. Egermier should be fired for "insubordination" for using the "f" word and for failing to teach the second REACT class.   Ms. Doorn and Mr. Tice together then asked Ms. Romey to fire Mr. Egermier for the same reason.

There is no evidence in the record that Mr. Tice, in talking to Ms. Doorn or Ms. Romey, ever informed either woman that it was commonplace for he and Mr. Egermier to use curse words when addressing one another.   There is also no evidence in the record that Ms. Romey knew of Mr. Tice's discriminatory statement.   But, she was undeniably influenced by Mr. Tice's report of apparent misconduct on the part of Mr. Egermier and she made her decision to terminate Mr. Egermier based on that report.   Thus, Pennington County may be liable under a mixed motive analysis if Mr. Egermier can demonstrate at trial that Mr. Tice's discriminatory animus was a proximate cause of his firing.   Staub v.

Proctor Hosp., 131 S. Ct. 1186, 1192–94 (2011).   Issues of proximate cause are
reserved for the jury except under circumstances where no reasonable mind
could differ.   See Heatherly v. Alexander, 421 F.3d 638, 642 (8th Cir. 2005).

### c.   Mershon and Kiel are Distinguishable

Pennington County primarily relies on two cases in support of its motion
for summary judgment:   Mershon v. St. Louis Univ., 442 F.3d 1069 (8th Cir.
2006) and Kiel v. Select Artificials, Inc., 169 F.3d 1131 (8th Cir. 1999) (en banc).
The court finds both of these decisions distinguishable from Mr. Egermier's case.

In Kiel, a deaf employee was fired when he was confronted about using a
photocopier for personal use and he shouted at his employer, "[y]ou're selfish,
you're selfish."   Kiel, 169 F.3d at 1134 (internal quotation marks omitted).   The
employer's stated reason for firing Kiel was insubordination.   Id.   The
document Kiel had been copying at the photocopier was a letter requesting a
telecommunications device as a reasonable accommodation for his hearing
disability.   Id.   Kiel then sued for "discriminatory discharge, retaliatory
discharge, and failure to accommodate under the ADA and the [Missouri Human
Rights Act]".   Id.   The Eighth Circuit affirmed the district court's grant of
summary judgment in favor of the employer.   Id.

The first basis upon which Kiel is distinguishable is that the Eighth Circuit
analyzed Kiel under the McDonnell-Douglas tripartite analysis because Kiel
produced no direct evidence of discrimination.   Id. at 1134–36.   This court
concluded that Mr. Egermier has produced direct evidence of discrimination in

this case.   Accordingly, the Eighth Circuit, in <u>Kiel,</u> applied a different analysis than what is applicable here.   Furthermore, in <u>Kiel</u>, the plaintiff did not deny engaging in insubordinate behavior as Mr. Egermier does herein, which creates a genuine issue of material fact in this case.   <u>Id.</u> at 1134.   Although Mr. Egermier does admit to having used the "f" word, he stated that such language was commonplace between him and Mr. Tice.   The plaintiff in <u>Kiel</u> never alleged that shouting "you're selfish" was commonplace or that any other employee had ever done so.   The <u>Kiel</u> court's comment that the ADA confers no right to be "rude" is undoubtedly true, <u>see id.</u> at 1136, but it is also true that a supervisor who has previously engaged in a pattern of coarse discourse with an employee and not complained cannot later rely upon the employee's use of such language to fire him, particularly after the supervisor has just voiced a discriminatory statement.

The court notes that Mr. Egermier's comments, including the use of the "f" word in his conversation with Mr. Tice, were in opposition to an employment practice Mr. Egermier reasonably believed to be wrong.   That is, Mr. Egermier believes that he should not have had to teach the REACT classes alone after revealing his disability to Pennington County and asking for a reasonable accommodation.   When an employee is protesting what he reasonably believes to be an unlawful employment practice, his conduct in protest of the practice must be reasonable in light of the circumstances, and the employer's right to maintain order in the work force must be balanced against the employee's right to express his grievances.   See <u>Payne v. McLemore's Wholesale & Retail Stores,</u>

41

654 F.2d 1130, 1142 (5th Cir. 1981).   If the employee's conduct in opposition is unreasonable, that may supply the employer with a legitimate, nondiscriminatory reason for its actions.   Id.; see also Kiel, 169 F.3d at 1138 (M. Arnold, J., dissenting).   It is the employer's burden to prove that an employee's opposition was unreasonable.   Payne, 654 F.2d at 1142.

Here, Pennington County never addresses Mr. Egermier's assertion that he and Mr. Tice frequently used coarse language with one another.   This would certainly bear on whether Mr. Egermier's use of the "f" word was reasonable under the circumstances.   The court notes that the conversation occurred in the privacy of Mr. Tice's office (Ms. Doorn's eavesdropping notwithstanding), which is far different than using curse words to announce one's opposition in a more public setting.   The court concludes that it is for a jury to determine the reasonableness of Mr. Egermeier's opposition under the circumstances.

The Mershon case, also relied upon by Pennington County is also distinguishable.   The Mershon case involved a disabled student at St. Louis University who was banned from campus after he told a civil rights investigator that his professor made him so mad he would like to put a "bullet in his head." Mershon v. St. Louis Univ., 442 F.3d 1069, 1071–73 (8th Cir. 2006) (internal quotation marks omitted).   The investigator reported the comment to university officials who then banned Mr. Mershon from campus.   Id. at 1073.   Mershon denied having made the statement and sued, alleging that the university had retaliated against him under the ADA.   Id. at 1073–76.

42

The Eighth Circuit affirmed the district court's grant of summary judgment in favor of the university despite Mr. Mershon's denial of having made the threatening statement.   Id. at 1078.   The Eighth Circuit held that the district court had not impermissibly resolved a credibility issue in granting summary judgment.   Id. at 1075.   Instead, the court held that whether Mr. Mershon actually made the statement was irrelevant; rather, what was undisputed was that the investigator *reported* that Mr. Mershon made the statement and the university, in good faith, relied on that report in deciding to ban Mr. Mershon from campus.   Id. at 1075–76.   Mr. Mershon offered no evidence of bad faith on the part of the university, nor did he offer evidence that the university's stated reason for banning him from campus was a pretext.   Id. Pennington County argues that Mr. Egermier's statement regarding the New York Yankees baseball team, as well as his cursing and alleged tantrum on the day he was fired, even if untrue, nevertheless provide Pennington County with a valid basis for firing Mr. Egermier because as it is undeniable that reports of this conduct were made to Ms. Romey.

The Mershon decision is distinguishable from this case in two ways. First, like Kiel, Mershon was analyzed under the McDonnell-Douglas tripartite analysis because Mr. Mershon provided no direct evidence of discrimination. Id. at 1074–75.   Here, Mr. Egermier produced direct evidence of discrimination and retaliation.

43

Second, unlike <u>Staub</u> and unlike this case, Mr. Mershon offered no evidence that the civil rights investigator, or any other person in the university's decisional chain-of-command, was imbued with discriminatory animus.   <u>Id.</u> Thus, the ultimate decision maker's conclusion to ban Mr. Merchon from campus was not infected with an underling's discriminatory animus.   <u>Id.</u>   As previously described above, that is not the case with Mr. Egermier's facts.

The court pauses to note that it does not condone Mr. Egermier's admitted use of the "f" word in his final workplace conversation with Mr. Tice.   However, the reasonableness of that language, under the circumstances, is for a jury to determine.   As for the alleged shouting and throwing of objects, Mr. Egermier denies doing both.   His credibility is also for the jury to determine.   Finally, the court notes that the ADA does not protect only the good or exemplary employees—it protects *all* employees from unlawful discrimination, even employees who misbehave or perform poorly.   <u>See</u> <u>Luster v. Ill. Dep't of Corr.</u>, 652 F.3d 726, 730 (7th Cir. 2011).   Here, Mr. Tice's remarks demonstrate both a disparaging attitude toward Mr. Egermier's disability and a resentment over having to accommodate that disability.   Either could support Mr. Egermier's claims of discrimination and retaliation.   Ultimately, it is for a jury to determine whether they in fact do support those claims.

## CONCLUSION

This court respectfully recommends that the motion for summary judgment filed by Pennington County [Docket No. 18] be denied in its entirety.

44

**NOTICE OF RIGHT TO APPEAL**

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1)(B), unless an extension of time for good cause is obtained.   See FED. R. CIV. P. 72(b). A party may respond to another party's objections within fourteen (14) days of being served with a copy.   Id.   Failure to file timely objections will result in the waiver of the right to appeal questions of fact.   Id.   Objections must be timely and specific.   Timely, specific objections to the findings and conclusions on the summary judgment motion will be reviewed *de novo* by the District Court. Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990) (per curiam); Nash v. Black, 781 F.2d 665 (8th Cir. 1986); see also 28 U.S.C. § 636(b)(1)(B) (2012).

Dated March 3, 2014.

BY THE COURT:

/s/ *Veronica L. Duffy*

VERONICA L. DUFFY
UNITED STATES MAGISTRATE JUDGE

45